IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2021

IN RE ELIJAH H.

**Appeal from the Juvenile Court for Wilson County**
**No. 2019-JT-2     Charles B. Tatum, Judge**
_____

**No. M2020-01548-COA-R3-PT**
_____

This termination of parental rights case focuses on Elijah H. ("the Child"), the minor child of Amanda H. ("Mother") and Kevin W. ("Father"). In March 2019, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Mother and Father in the Wilson County Juvenile Court ("trial court"). The Child had previously been removed from Mother's custody after he was born exposed to drugs. Father was incarcerated prior to the Child's birth and has remained so continuously since that time, awaiting trial for pending criminal charges, including first degree murder. During a bench trial, Mother voluntarily surrendered her parental rights to the Child.[1] At the conclusion of the bench trial, the trial court terminated Father's parental rights to the Child, finding by clear and convincing evidence that Father had abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to Father's incarceration and that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. The trial court further found by clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights. Father has appealed. Having determined that DCS presented insufficient evidence that Father knew of the Child's existence at the time of his criminal behavior, we reverse the trial court's finding that Father abandoned the Child by exhibiting wanton disregard for the Child's welfare. We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

---

[1] The surrender of Mother's parental rights to the Child is not at issue on appeal. We will therefore confine our analysis to those facts relevant to Father's appeal.

Lee W. McDougal, Gallatin, Tennessee, for the appellant, Kevin W.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

Shortly following the Child's birth in July 2017, DCS was notified that the Child had been born exposed to drugs. As a result, DCS filed a petition to transfer temporary legal custody, requesting that the trial court adjudge the Child dependent and neglected, as well as severely abused, and transfer temporary legal custody to K.S. and C.S., referred to in the record as Mother's cousins or family friends. In this petition, DCS specifically alleged that Mother had exposed the Child to drugs *in utero* and that due to his incarceration, Father was unable to care for the Child. DCS included reference to Mother's statement that Father was incarcerated in the Davidson County Detention Facility, that Mother was no longer in a relationship with Father, and that Father had a history of domestic violence against her. According to DCS, following the Child's birth, Mother had entered into an "Immediate Protection Agreement and a Non-Custodial Family Permanency Plan," placing the Child in the temporary custody of K.S. and C.S. and requiring Mother to complete tasks to remedy the conditions that prompted DCS's involvement. On July 19, 2017, the trial court entered an order granting DCS's petition, finding probable cause that the Child was dependent and neglected and severely abused.

On October 6, 2017, DCS filed a petition for temporary legal custody, asserting that K.S. and C.S. had expressed that they would no longer be able to care for the Child. DCS alleged, *inter alia*, that Father and Mother had failed to rectify the conditions that led to DCS involvement, specifically averring that Father was still incarcerated and would be for "a substantial period of time." On October 9, 2017, the trial court entered an *ex parte* order awarding temporary legal custody of the Child to DCS.

In an order entered on May 16, 2018, the trial court adjudicated the Child dependent and neglected following a hearing conducted on March 6, 2018. During the hearing, Father stipulated that the Child lacked a legal custodian at the time DCS filed its petition and that he was unable to parent the Child due to his incarceration. Father agreed that DCS had presented sufficient evidence to prove by clear and convincing evidence that the Child was dependent and neglected. The court also deemed visitation with Father untenable due to his incarceration. The trial court declared Father to be the legal father of the Child by an order of paternity entered on August 20, 2018.

On March 26, 2019, DCS filed the instant petition to terminate Father's and Mother's parental rights to the Child. As to Father, DCS alleged three statutory grounds:

(1) abandonment by an incarcerated parent by exhibiting wanton disregard for the Child's welfare, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Relative to the first ground, DCS alleged that Father had been incarcerated since January 2017 and was awaiting trial for pending criminal charges, including a charge of first degree murder. DCS specifically alleged that both Father and Mother had engaged in "dangerous criminal enterprises" during Mother's pregnancy. DCS further alleged that this conduct constituted wanton disregard for the Child's welfare as well as severe child abuse. With regard to the remaining ground, DCS alleged that Father had failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Child and that placing the Child in his custody would pose a risk of substantial harm to the Child's welfare.

The trial court conducted a bench trial concerning the petition to terminate Father's and Mother's parental rights to the Child on November 11, 2020. Brandi Hill, a DCS team leader, testified that she had supervised the case managers who handled the Child's custody case and that she was familiar with the proceedings. Ms. Hill related that in the course of her supervision, she had reviewed Father's criminal records. During her testimony, Ms. Hill read into evidence the contents of the arrest warrant affidavit related to Father's January 2017 arrest. The arrest warrant affidavit stated in relevant part:

> On January 18, 2017 at approximately 14:25 hours the defendant [Father] did commit Homicide of [the victim]. The Co Defendant [Mother] and witness in the incident stated the defendant was driven to [the victim's address] by the co-Defendant. The co-defendant knocked on the door and the victim answered. The defendant pushed his way through the front door armed with a black 38 revolver. Once in the home the defendant demanded money and pills. When the victim stated he did not have any the defendant shot the victim in the head. The defendant fled the home and the co-defendant drove him from the scene. The victim was transported to Vanderbilt Hospital where he was pronounced dead. The co-Defendant in the case is also the defendant's girlfriend.

Ms. Hill testified further that Father had been incarcerated since January 18, 2017, and that the charges related to this event were still pending as of trial in the present action. We note that Mother was a co-defendant in Father's criminal case and was the co-defendant and "girlfriend" referenced in the arrest warrant affidavit. Mother was arrested for charges related to this crime in February 2018.

Ms. Hill also read the contents of the indictment brought against Father. The indictment, returned on July 23, 2019, charged Father with two counts of first degree murder, one count of attempted especially aggravated robbery, one count of attempted first degree murder, one count of especially aggravated burglary, two counts of employing a

- 3 -

firearm during the commission of a dangerous felony, and one count of being a felon in possession of a firearm. The indictment included a finding by the grand jury that Father had previously been convicted of two counts of attempted second degree murder in 2005 in Hamblen County.

In addition, Ms. Hill read the contents of two misdemeanor charges previously lodged against Father. On November 21, 2014, Father received a citation for driving without a valid driver's license, a charge that was subsequently dismissed. Father was also charged with misdemeanor theft in June 2017. This charge was dismissed on June 16, 2017. Father served eleven days and twenty-two hours in jail pending the disposition of the misdemeanor theft charge.

As explained by Ms. Hill, Father had been incarcerated due to the pending charges related to the events of January 18, 2017, for the entirety of the Child's life. Relative to visitation, Father had only seen the Child in person on two or three occasions while present at court proceedings, where the two had spent less than a combined one hour together. According to Ms. Hill, Father had maintained no communication with the Child by telephone or any other means. With respect to the permanency plan, Ms. Hill reported that Father had completed everything required in the plan that could reasonably be expected given his incarceration. Notwithstanding, Ms. Hill acknowledged that resolving his legal issues was a component of Father's permanency plan that he had not yet accomplished.

During the course of her testimony, Ms. Hill articulated that when a child has been in DCS custody for fifteen months, DCS must perform "special reviews and justification on when and if or why [they] haven't filed a [termination petition]." *See* Tenn. Code Ann. § 36-1-113(h)(1)(A) (2021). Ms. Hill confirmed that DCS usually considers filing a termination of parental rights petition after fifteen months of custody because permanency for the child needs to be achieved. The Child had been in DCS custody for thirty-seven months by the time of trial. Ms. Hill further related that if the petition were to be denied by the trial court and custody of the Child awarded to Father, the Child would not have a home in which to reside.

Ms. Hill explained that she lacked information as to when Father would stand trial to resolve his criminal charges and did not have "any knowledge about the criminal case." However, DCS case notes reflected that Father in fact desired to proceed with his criminal trial. When Ms. Hill discussed the case with Father, she did not form the impression that he was attempting to delay his criminal prosecution. Rather, Father stated to her that he wished to have a trial so that the charges could be dismissed and he could be released from prison. Concerning care for the Child, Ms. Hill opined that Father did not maintain the ability but had expressed a willingness.

Father chose to testify during the trial. In anticipation of Father's exercise of his right against self-incrimination under the Fifth Amendment to the United States

- 4 -

Constitution, the trial court clarified at the outset that DCS could ask Father questions, that Father could refuse to answer certain questions, and that a negative inference could arise from Father's refusal. Accordingly, Father invoked his Fifth Amendment right against self-incrimination in response to, *inter alia*, questions regarding his relationship with Mother.

Concerning the Child, Father testified that he had no doubt that the Child was his son. Maintaining that he enjoyed a parental bond because the Child was his son, Father acknowledged that the Child had not had the opportunity to develop a relationship with him. According to Father, he had seen the child twice in court for a sum total of approximately ten minutes. Father further explained that he first learned that Mother was pregnant when he received certain papers from DCS, which would have occurred after the Child's birth. Father answered in the negative when asked whether he "tried to get [Mother] to end her pregnancy prematurely." Father specifically denied attempting to kill Mother, "pull[ing] a gun on her," or telling her to drink Drano or bleach. Father added that he was shocked when he discovered that the Child was born exposed to drugs. According to Father, he was surprised that Mother had used drugs while she was pregnant. Father further claimed that he did not use drugs.

Concerning his care for the Child, Father insisted that he was willing to raise him on his own. Considering his incarceration, however, he desired a family member to have custody of the Child in the meantime. Despite having been provided with names of suggested family members for placement, after conducting background checks, DCS concluded that these family members were not "sustainable" options. Consequently, in its October 6, 2017 petition, DCS averred that the family members whom Father had suggested were inappropriate given that one was "a previously substantiated perpetrator of child abuse" and the other had admitted to using marijuana daily and had previously been charged with attempted murder.

Taylor Renfroe, a family support worker with DCS, testified that she was currently assigned to the Child's case and had been for the year prior to trial. Ms. Renfroe explained that at the time she was assigned to the Child's case, the Child was living with his foster parents, M.P. and J.P. ("Foster Parents"). According to Ms. Renfroe, the Child was doing "great" and "meeting all of his developmental milestones" under the care of Foster Parents. Ms. Renfroe also indicated that "[the Child] is in a wonderful place with the [Foster Parents]," relating that he referred to Foster Parents as "Mommy and Daddy." In addition, she held no concerns regarding the Child's care by Foster Parents, had never felt as though she needed to correct Foster Parents, and described Foster Parents' home as "the best place where – at this time that [the Child] could be."

Ms. Renfroe described Foster Parents as "preadoptive" and confirmed that they had embraced full initiative in their parenting of the Child. She stated that Foster Parents helped the Child with his educational needs and were "very attentive to his medical concerns."

According to Ms. Renfroe, Foster Parents took the lead in finding daycare for the Child and had "stepped up" in making important decisions relative to the Child. Ms. Renfroe confirmed that she believed that Foster Parents had gone above and beyond in their care for the Child. In Ms. Renfroe's estimation, the Child's best interest would be served by his remaining in the care and custody of Foster Parents.

Concerning the relationship between Father and the Child, Ms. Renfroe opined that the Child did not know Father in any meaningful way. She also stated that restoring custody to Father would negatively impact the Child because the Child was currently in "a stable environment where he is loved and taken care of, and to pull him from the family that he has known since being put into custody would be very traumatic to him, very life-altering in regards to the family that he has known since being brought into this world." Ms. Renfroe included that she was unsure of any program where a three-year old child could live in the Davidson County correctional facility. Moreover, she described Father's pending criminal charges as a "road bump" to permanency for the Child.

J.P. ("Foster Mother") testified that her husband and she had been the Child's foster parents since March 2018 and that they had raised the Child since he was nine months old. According to Foster Mother, her husband and she had taken education classes necessary to adopt the Child because it was their desire to adopt the Child. Foster Mother confirmed that the Child called her "Mama" and her husband "Daddy" and that her husband and she enjoyed a positive support system and a large extended family who loved the Child. According to Foster Mother, the Child had never mentioned Father and did not even know who Father was, considering the Child's only interaction with him had been in court two years prior to the termination trial.

On December 21, 2020, the trial court entered a final order terminating Father's parental rights to the Child. The court determined that DCS had proven by clear and convincing evidence that Father had exhibited a wanton disregard for the Child's welfare, establishing the respective statutory ground of abandonment. The court also noted that Father had a criminal history such that he had knowledge of the criminal justice system and the consequences of engaging in unlawful conduct. The court concluded that DCS had also proven by clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child and that placing the Child in Father's custody would pose a risk of substantial harm to the Child's welfare. However, the court determined that DCS had failed to prove by clear and convincing evidence the ground of severe child abuse with regard to Father. The court further determined that the Child's best interest would be served by the termination of Father's parental rights. Father timely appealed.

## II.  Issues Presented

Father raises the following issue, which we have restated slightly as follows:

1. Whether the trial court erred by finding clear and convincing evidence supporting statutory grounds to terminate Father's parental rights to the Child.

DCS raises an additional issue, restated slightly as follows:

2. Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and

consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (2021) lists the statutory requirements for termination of parental rights, providing in relevant part:

   (a)   The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship

- 8 -

rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)    Termination of parental or guardianship rights must be based upon:

    (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

    (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

In its final order, the trial court concluded that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Father's parental rights: abandonment by an incarcerated parent, *see* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(iv), and failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child, *see* Tenn. Code Ann. 36-1-113(g)(14).  We will address each statutory ground in turn.

A.  Statutory Abandonment

The trial court terminated Father's parental rights to the Child based on abandonment by an incarcerated parent exhibiting wanton disregard for the Child's welfare.  Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2018) provides as a definition of abandonment:

    (iv)    A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

As an initial matter, it is undisputed that Father has been incarcerated for the entirety of the Child's life.  Father was arrested on January 18, 2017, over five months before the birth of the Child, and has remained incarcerated continuously since that date.

- 9 -

With regard to this termination ground, this Court has previously explained:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Taxonomy of Children's Rights,* 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005) (footnote omitted). Furthermore, this Court has concluded that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

However, for this ground to apply to a parent's pre-incarceration behavior, the parent must have knowledge of the child's existence. *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). In interpreting Tennessee Code Annotated § 36-1-102(1)(A)(iv), this Court has concluded:

> Logically, a person cannot disregard or display indifference about someone whom he does not know exists. In our opinion, while the statutory reference to "the child" can mean a child *in utero*, the wanton disregard language of Tenn. Code Ann. § 36-1-102(1)(A)(iv) must be construed to require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken.

*Id.*

Although much of the focus and discussion surrounding this ground at trial concerned whether Father knew that Mother was pregnant with the Child at the time of his arrest, Father has not presented this argument on appeal. Nevertheless, DCS has addressed the issue in its brief and argued that the evidence was sufficient to establish that Father knew Mother was pregnant with the Child at the time of his arrest in January 2017. Because Father's knowledge of the Child's existence is a threshold element of this statutory ground, we will first address DCS's postulate that sufficient evidence was presented at trial to prove Father's knowledge of Mother's pregnancy at the time of his pre-incarceration conduct.

In closing argument during the termination trial, DCS requested that the trial court make a finding that Father "knew he had a baby coming," acknowledging that this was an element it had to prove. In response, Father's attorney contended that DCS had failed to prove that Father had knowledge of Mother's pregnancy at the time of his pre-incarceration conduct in January 2017. The trial court made no specific finding of fact, either at trial or in its written order, that Father knew at the time of his arrest that Mother was pregnant with the Child. In its written order, the trial court made the following findings of fact related to Father's knowledge of Mother's pregnancy:

> [Father] refused to answer questions about his relationship with [Mother] . . . .

> [Father] denied knowing [Mother] was pregnant until being served paperwork by DCS.

> [Father] would not answer a question posed by DCS about whether he had a sexual relationship with [Mother].

> [Father] acknowledged that DNA Paternity testing had definitively determined he was the biological father of the child.

> [Father] acknowledged that, after DNA testing and before he knew the results of the test, he knew he would ultimately be the child's father.

(Paragraph numbering omitted.) Although these facts indicate that Father knew the Child was his child, they do not prove when he knew Mother was pregnant or specifically that Father knew Mother was pregnant at the time of his pre-incarceration behavior in January 2017.

DCS argues that the evidence at trial undergirds a finding that Father knew Mother was pregnant at the time of his arrest. In support, DCS posits that the trial court properly drew a negative inference from Father's invocation of his Fifth Amendment right against self-incrimination in response to questions regarding his relationship with Mother.

- 11 -

According to DCS, the permissible negative inference was bolstered by corroborating evidence demonstrating that "Father was in a romantic relationship with Mother at the time and was aware of Mother's pregnancy." DCS argues that the negative inference drawn was supported by: (1) Father's denial that he had asked Mother to terminate her pregnancy early, which indicated that he knew Mother was pregnant; (2) Father's testimony that he had "no doubt" that the Child was his son; and (3) Ms. Renfroe's identification of Mother as Father's co-defendant and the "girlfriend" referenced in the arrest warrant affidavit.

In civil cases, trial courts may draw negative inferences from a party's invocation of the Fifth Amendment right against self-incrimination. *Levine v. March*, 266 S.W.3d 426, 442 (Tenn. Ct. App. 2007) ("[T]he majority of jurisdictions, including Tennessee, permit fact-finders to draw adverse inferences against parties who invoke their Fifth Amendment rights in civil case.") However, no negative inference may be taken unless corroborating evidence is presented to support the "fact under inquiry." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 506 (Tenn. 2012).

In the present cause, the trial court does not state in its order whether it drew a negative inference from Father's silence in response to questions concerning his relationship with Mother. Moreover, even had the court inferred that Father and Mother were in a romantic relationship at the time of Father's pre-incarceration conduct, this alone would not prove the imperative fact of when Father knew Mother was pregnant with the Child. *See In re Michael O.*, No. W2017-01412-COA-R3-PT, 2018 WL 576777, at *7 (Tenn. Ct. App. Jan. 26, 2018) (concluding that the evidence was insufficient to prove whether the father was aware of the pregnancy at the time of his pre-incarceration conduct, even though the father and mother lived together and were married at the time).

In addition, DCS's corroborating facts also fail to establish when Father knew Mother was pregnant. The only evidence presented at trial was Father's testimony that he did not know Mother was pregnant until he was served with paperwork from DCS, which would not have occurred before the Child's birth in July 2017, over five months following his arrest. The burden was upon DCS to prove Father's knowledge and when it was held. As DCS failed to produce sufficient evidence to overcome Father's testimony, we conclude that DCS failed to prove Father knew of the Child's existence at the time of his pre-incarceration conduct leading to his arrest and incarceration.

In the absence of establishing at what point Father became aware of Mother's pregnancy with the Child, we cannot conclude that Father exhibited wanton disregard for the Child at the time of his alleged offenses and arrest. *See In re Michael O.*, 2018 WL 576777, at *7 (concluding that the evidence failed to "establish at what point Father knew or even suspected that Mother was pregnant with the child at issue" when DCS only proved that (1) the father was the child's biological father, (2) the father's name was on the birth certificate, (3) the mother and father lived together for several months, and (4) the mother and father were married); *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574,

- 12 -

at *12 (Tenn. Ct. App. June 6, 2017) (reversing the trial court's finding that the father abandoned the child by wanton disregard because the record was "silent with respect to when Father was first aware of Mother's pregnancy"); *In re Anthony R.*, 2015 WL 3611244, at *3 (concluding that the petitioner did not prove that the father knew of the mother's pregnancy when the father testified that he did not know the mother was pregnant until after the baby was born and several months after his arrest).

The evidence presented at trial preponderates against the trial court's implicit finding that Father knew of the Child's existence at the time of his arrest. As a result, we determine that the statutory ground of abandonment by wanton disregard was unsupported by clear and convincing evidence. We therefore reverse the trial court's conclusion concerning this ground.

### B. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody of or Financial Responsibility for the Child

Father also argues that the trial court erred by finding that DCS had proven by clear and convincing evidence that he had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (2021) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody or financial responsibility of the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

With regard to the first prong of this statutory ground, Father specifically contends that DCS did not present clear and convincing evidence to support the trial court's finding that Father had failed to manifest a willingness to assume custody and that the court failed to make a conclusion of law as to Father's ability. As such, Father argues that "neither factor in the first prong" was satisfied. Father additionally urges that the trial court's finding of a risk of substantial harm was based solely on Father's incarcerated status, which alone is insufficient to support termination of parental rights. We will address each element of this ground in turn.

- 13 -

In asserting that the trial court failed to address his ability to assume custody, Father alludes to the trial court's conclusion of law in its written order, which stated: "Pursuant to T.C.A. § 36-1-113(g)(14), there is clear and convincing evidence that [Father] has failed to manifest a willingness to assume legal and physical custody of the child, such that . . . [Father's] parental rights should be terminated." Although the court did not reference Father's ability to assume custody in that particular conclusion, the court did conclude that Father had failed to manifest both an ability and willingness to assume custody of the Child in two other sections of its written order. The conclusion that Father had failed to manifest an ability is also consistent with the trial court's oral findings announced at trial, in which the court stated: "[Father] has indicated that he has a willingness, but the ability is not there, and the best interest is clear." Because the court's written order contains two additional determinations concluding that Father had failed to manifest both an ability and willingness, and the court orally stated the same conclusion at the end of trial, we determine that the court's singular omission of Father's ability in one section of its written order constitutes harmless error.[2] Thus, we will analyze the trial court's conclusion as to both Father's ability and willingness to assume custody of the Child.

We agree with Father, and DCS appears to concede on appeal, that the evidence presented at trial does not support the trial court's conclusion that Father had failed to manifest a willingness to assume custody of the Child. Moreover, the trial court's findings of fact do not support such a conclusion. In its written order, the court made the following findings of fact pertinent to Father's willingness:

> DCS ratified several permanency plans throughout the pendency of this case. On each occasion, [Father] was incarcerated. The testimony indicated that [Father] has completed what he could on the permanency plan, with certain limitations related to his incarceration.
>
> * * *
>
> [Father] did advise that he had a desire to be [the Child's] father at the conclusion of his case in Davidson County.

---

[2] We note that trial courts speak through their written order rather than oral rulings. *City of Oak Ridge v. Levitt*, 493 S.W.3d 492, 503 (Tenn. Ct. App. 2015). Nevertheless, in this case, the trial court's oral ruling with respect to Father's ability shed lights on the court's written order and supports its written ruling that Father had failed to manifest an ability to assume legal and physical custody of or financial responsibility for the Child. *See Williams v. City of Burns*, 465 S.W.3d 96, 119-20 (Tenn. 2015) ("'It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts— and that the appellate court reviews the trial court's written orders.' . . . Nevertheless, we have recognized that a trial court's order 'should be construed with reference to the issues it was meant to decide, and should be interpreted in light of the context in which it was entered.'" (quoting *Morgan Keegan v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013)) (footnote omitted).

Contrary to the trial court's conclusion in its written order, these findings of fact indicate that Father had manifested a willingness to assume custody. Although it is true that in evaluating a parent's willingness to assume custody and responsibility of his child, we look for more than "mere words," *see In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019), here, Father has also demonstrated a willingness through his actions by completing what he could of the permanency plan, *cf. In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *7 (Tenn. Ct. App. Jan. 31, 2020) (concluding that the parent had "failed to comply with or complete any of the permanency plans' requirements, which this Court has held constitutes a failure to manifest an ability and willingness to assume custody or financial responsibility of a child").

Father's willingness to assume custody was confirmed by Ms. Hill, who acknowledged during trial that Father had completed everything in the permanency plan that he could while incarcerated. In addition, the Court Appointed Special Advocate's report noted that Father had participated via telephone in the Child and Family Team Meetings, continued to display an interest in the Child, and completed a parenting assessment. Although Ms. Hill later stated that Father had not resolved his legal issues— a goal delineated in the permanency plan—we cannot find that the resolution of Father's criminal charges is completely within his control, particularly when DCS failed to present proof evincing that Father had purposefully delayed his criminal trial. Moreover, Ms. Hill testified that DCS's documentation reflected that Father desired to proceed with his criminal trial and that she did not form the impression that he was trying to delay the prosecution. Therefore, we cannot conclude that the delay in Father's criminal trial reflects a lack of willingness on his part to assume custody.

We therefore determine that the trial court's conclusion that Father had failed to manifest a willingness to assume custody of the Child was not supported by clear and convincing evidence. However, inasmuch as DCS necessarily had to prove either a failure to manifest a willingness or a failure to manifest an ability, we must now address whether the trial court's determination that Father had failed to manifest an ability to assume custody of the Child was supported by clear and convincing evidence. *See In re Neveah M.*, 614 S.W.3d at 677 ("If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied.").

Although the trial court included only a conclusory statement that Father had failed to manifest an ability and willingness to assume custody of the Child in the conclusions of law in its written order, the court otherwise made sufficient findings of fact relevant to Father's ability to assume custody of the Child. The court found that Father was "incarcerated in January 2017 and [had] remained in jail continuously since that time." In addition, the trial court found that Father's criminal trial had been continued several times

- 15 -

and that neither Father nor DCS witnesses knew when the trial would be conducted. The trial court's findings of fact further provided that Father had been convicted of attempted murder in Hamblen County in 2005. The indictment related to Father's pending charges supports this finding, listing Father's two previous convictions for attempted second degree murder in 2005 in Hamblen County.

Although not included in the court's findings of fact, when questioned regarding how he would raise the Child if afforded the opportunity, Father responded that he would have a family member obtain custody of the Child presumably until he was released and could obtain custody himself. However, Father also conceded that DCS had conducted background checks on Father's proposed family members and determined that they were not viable options. Inasmuch as Father had been incarcerated continuously for nearly four years without a resolution of his charges, we conclude that the trial court properly found by clear and convincing evidence that Father did not have the ability to care for the Child.

Whether incarceration alone is sufficient to prove that a parent lacks the ability to care for his child has recently been addressed by this Court in *In re Ahleigha C.*, in which the majority held that incarceration alone is insufficient to satisfy either the first or second prong of this ground. No. E2020-01683-COA-R3-PT, 2021 WL 3401021, at *7-8 (Tenn. Ct. App. Aug. 4, 2021). We determine *Ahleigha C.* to be distinguishable from this case, however, because the father therein confronted only one criminal charge and DCS presented no evidence of a history of criminal behavior on the part of the father. *See id.* at *8. In fact, as mentioned in a footnote, the *Ahleigha C.* Court distinguished the father's circumstances in that case from other actions where a history of criminal behavior had been demonstrated. *See id.* at n.8.

Father's situation is similar to several other cases in which this Court has determined that a parent's incarceration and criminal history constituted clear and convincing evidence that the parent had failed to manifest an ability to assume custody. *See In re Jeremiah S.*, 2020 WL 1951880, at *8 ("Mother has been incarcerated since March 22, 2017 – about half of Jeremiah's life and nearly all of Joseph's, evidencing a clear inability to assume custody and financial responsibility, despite any amount of willingness."); *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *8 (Tenn. Ct. App. Apr. 9, 2020) ("In light of the above standards and the evidence in the record, we agree with the trial court that Mother's history of drug abuse and both parents' repeated criminal conduct and resulting incarceration demonstrates that each lacks the ability to parent Eli."); *In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (determining that the father had "failed to demonstrate any ability or willingness to personally assume legal and physical custody or financial responsibility of any of the children" when his "history [was] replete with drugs and crime" and he was "serving a twenty-four year sentence"); *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018) (determining that the parents, who were both incarcerated at the time of trial, "lacked the ability to assume custody of the Children" and

that "each parent knowingly engaged in repeated criminal conduct that necessitated their re-incarceration and would put the Children at physical and/or psychological risk if placed in their custody"). By reason of Father's current incarceration and his history of criminal behavior, we determine that the trial court properly found that Father lacked the ability to assume custody of the Child.

Furthermore, DCS presented ample evidence to prove a risk of substantial harm to the Child if returned to Father's custody. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court's findings of fact support its conclusion that the Child would be at risk of substantial harm if returned to Father's custody. The court made the following findings of fact relevant to this element:

> The Court finds that it is clear from the best interest determination that this minor child is right where he needs to be. The child is three and a half years old. The Court further finds that the majority of what . . . cognitive ability the child has right now, things that he can remember, colors he can identify, foods he likes – all of that's happened in the [Foster Parents'] home.

> The Court finds that there is no question that the child is bonded with his foster parents. The foster parents love him. The foster parents have provided for him on a day to day basis, 24/7, since March of 2018.

> The Court finds that there is no identifiable bond between the child and [Father]. Further, [Father] even acknowledges that, while he feels bonded to [the Child], he says [the Child] has not had the opportunity to develop a bond with him.

> The Court finds that you cannot press a pause button on this child's life. There is no way to do it. This child is going to continue to develop,

going to continue to grow, going to continue to evolve, and in the situation that he is in right now, he is thriving.

* * *

[Father] is interested in his outlook, and as well as he should be, but this child should not suffer and not languish in foster care without permanency and lack of future because of [Father's] choices to not actively proceed with his case.

* * *

[Father has] been incarcerated this child's entire life and then a few months more. He has no relationship with his child whatsoever other than having a common DNA. There is no meaningful relationship. There is no bond, and the child calls someone else his father.

(Paragraph numbering omitted.)

The evidence does not preponderate against these findings of fact. The evidence overwhelmingly demonstrates that the Child has bonded to Foster Parents, has thrived in their custody, and has never known Father in any meaningful way. Due to these circumstances, placing the Child in Father's custody would clearly pose a risk of substantial harm to the Child's welfare.

This Court has previously determined that removing a child who has "bonded and thrived" with his current family and placing a child in the custody of a near-stranger would amount to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger."); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year).

In the case at bar, removing the Child from Foster Parents who have cared for him since he was nine months of age and placing him in Father's custody would undoubtedly pose a risk of substantial harm to the Child. Father is a stranger to the Child. Father has been incarcerated for the Child's entire life, and Father testified that he had spent a total of ten minutes with the Child. Foster Mother testified that the Child did not mention Father and did not even know who Father was. She also stated that the last time the Child saw Father was briefly in court two years prior to the termination trial. Furthermore, the

evidence presented at trial overwhelmingly supports the trial court's conclusion that the Child had bonded and thrived with Foster Parents. Thus, removing the Child from Foster Parents, with whom he has certainly become attached and calls "Mama" and "Daddy," would present a risk of substantial harm to the Child's welfare. Despite Father's argument, additional factors other than Father's incarceration strongly support the trial court's conclusion that placing the Child in Father's custody would present a risk of substantial harm to the Child.

Upon careful review, we conclude that clear and convincing evidence supported the trial court's finding that Father had failed to manifest an ability to assume legal and physical custody of or financial responsibility for the Child and that placing the Child in Father's custody would put the Child's welfare at risk of substantial harm. Ergo, this statutory ground for termination of Father's parental rights has been established, and the trial court's conclusion is affirmed.

## V. Best Interest of the Child

Although Father has not challenged the trial court's determination that termination of Father's parental rights was in the best interest of the Child, DCS has raised the issue, correctly noting that we must review the court's best interest finding regardless of whether it is raised as an issue by the appellant. *In re Carrington H.*, 483 S.W.3d at 525-26. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the termination petition was filed in the instant action listed the following factors for consideration:[3]

---

[3] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of

- 19 -

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

parental rights.  *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205).  However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here.  *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

(9)   Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has instructed regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."  In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis.  In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  Id.  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  Id.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination.  White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case.  See In re Audrey S., 182 S.W.3d at 878.  Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.  In re Carrington H., 483 S.W.3d at 523.  "[D]epending upon the circumstances of a particular child and a particular parent, the consideration

- 21 -

of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Father's parental rights to the Child. In its written order, the trial court specifically found as follows:

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1) is applicable in this matter. Thus, the Court finds that it is in the best interest of the minor child for termination to be granted as to [Father], because [Father] has not made changes in his conduct or circumstances that would make it safe for the child[] to go home. Specifically, from birth of the child[] until the conclusion of the hearing on November 11, 2020, [Father] has been incarcerated in Davidson County correctional institutions. There has been no change in [Father's] circumstances from the child's birth to now. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(2) is applicable in this matter. Thus, the Court finds that it is in the child's best interests for termination to be granted as to [Father], because he has not made lasting changes in his lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. DCS has been limited in what services have been available to [Father] because [Father] has been continuously incarcerated the entire pendency of the custodial case. Nonetheless, DCS has made reasonable efforts as feasible under the circumstances. [Father] has not made a lasting adjustment and could not testify to when his trial will be held in his criminal case. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(3) is applicable in this matter. The Court finds that it is in the child's best interests for termination to be granted as to [Father], because [Father] has not engaged in regular visitation with the child. [Father] has visited the

child on two occasions, in the Wilson County Juvenile Court, for about five (5) minutes on each occasion. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(4) is applicable in this matter. The Court finds that it is in the child's best interests for termination to be granted as to [Father], because . . . no meaningful parent/child relationship between [Father] and [the Child] exists. The child has spent approximately ten (10) minutes of his life with [Father]. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(5) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because changing caregivers at this stage of the child's life would have a detrimental effect on him. [The Child] has been with his current family for a period of approximately 19 months at the time of the hearing. [The Child] views his foster mother and father as his parents. [The Child] is in a very stable and loving home with the foster family and is thriving. It is entirely untenable for the child to be placed with [Father] as he remains incarcerated. [Father] and the child have no relationship. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(6) is not applicable in this matter and does not weigh in favor of, or against, termination.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(7) is applicable in this matter. Thus, the Court finds that . . . it is in the child's best interest for termination to be granted as to [Father], because the home of [Father] is a correctional facility and not appropriate for a minor. Furthermore, [Father] has previously served significant prison time in Hamblen County, Tennessee for an attempted murder conviction and currently awaits trial on a homicide charge in Davidson County, Tennessee. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(8) is applicable as there was no proof in the record as to an emotional or mental deficit for [Father]. As such, this factor weigh[s] against termination.

- 23 -

The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(9) is not applicable in this matter and does not weigh in favor of, or against, termination. [Father] has been incarcerated throughout the entire life of the child and as such, has been unable to provide support.

* * *

Having evaluated all of the relevant best interest factors found in T.C.A. § 36-1-113(i), there is clear and convincing evidence that it is in the best interest of the minor child for the parental rights of [Father] to be forever terminated.

Upon careful review, we agree with the trial court's determination that termination of Father's parental rights was in the Child's best interest.

The trial court found that six of the nine best interest factors weighed in favor of terminating Father's parental rights to the Child. The court determined that factor eight, whether Father's mental and/or emotional status would be detrimental to the Child, weighed against termination because DCS had presented no proof of any mental or emotional deficit suffered by Father. The court found factor nine to be essentially neutral, noting that Father had been incarcerated throughout the Child's entire life and had been unable to provide support. The record supports the trial court's findings concerning these factors. The trial court also found that factor six was neutral, ostensibly because DCS presented no evidence to suggest that Father had shown brutality or abuse toward the Child or anyone else in his family or household. However, due to this lack of evidence, the trial court should have weighed this factor against termination of Father's parental rights, rather than neutrally. *See In re Braelyn S.*, 2020 WL 4200088, at *20 ("In the absence of evidence that tied Father to abuse, an unsafe home, or an unstable mental or emotional state, we must conclude that these factors weigh against termination.").

The trial court weighed the first two factors against maintaining Father's parental rights. The first two factors relate to Father's adjustment of circumstance, and the second factor specifically includes DCS's efforts to aid Father in making lasting adjustments. Although Father does not challenge the court's best interest finding, he has argued elsewhere that the court erroneously attributed the delay of his criminal trial to Father. As with Father's alleged failure to manifest a willingness to assume custody, DCS presented no evidence to indicate that Father had purposefully delayed his criminal trial, prolonged his incarceration, or had control over his criminal case to hasten resolution of his charges. From the record, it appears that both Father and DCS were hindered to some extent in their efforts to make an adjustment in Father's situation considering his incarceration and pending charges.

- 24 -

However, we do not conclude that the evidence preponderates against the court's finding as to these two factors because "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. In addition, "[t]his court has frequently and for a long time recognized that, as a general proposition, a child's best interest was served by termination of parental rights where, no matter the cause, there was no reasonable expectation the child could be reunited with a parent in the near future." *In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073, at \*13 (Tenn. Ct. App. Dec. 2, 2005) (emphasis added). Concerning the Child's perspective, it matters not whether Father's failure to make an adjustment to his circumstances was due to Father's failure to file a motion for a speedy trial or a motion for a bond hearing, as the trial court had determined. The fact remains that Father has been incarcerated for the first three years of the Child's life and continues to be incarcerated. To the extent that it was error for the court to place fault with Father, we find this to be harmless error because from the Child's perspective, Father's situation remains incompatible with parenting and providing a stable home for the Child. Therefore, we conclude that the evidence does not preponderate against the court's findings as to the first two factors.

With regard to factor three, we also conclude that the evidence does not preponderate against the trial court's finding that this factor weighed in favor of termination. Father testified that he had been able to visit with the Child only twice for a total of ten minutes at the Wilson County Juvenile Court. These brief visits over three years' time do not constitute regular visitation. Although this minimal visitation is by reason of Father's incarceration, this Court has previously concluded that "the reasons for the lack of interaction matter little." *See White v. Moody*, 171 S.W.3d at 194. Due to Father's incarceration and his brief encounters with the Child, this factor weighs in favor of terminating Father's parental rights because Father is little more than a stranger to the Child. These facts also support the court's conclusion that factor four, whether a meaningful relationship exists between Father and the Child, weighed in favor of terminating Father's parental rights.

As noted earlier with respect to the potential risk of substantial harm to the Child's welfare, the evidence at trial supported the trial court's finding that factor five weighed in favor of termination. The Child has bonded with Foster Parents, thrived under their care, and developed a significant attachment. To return the Child to Father, a near-stranger, and remove him from Foster Parents' care and custody would likely have a deleterious effect on the Child's emotional and psychological condition.

Lastly, the evidence supports the trial court's conclusion that factor seven weighs in favor of terminating Father's parental rights. Father had been incarcerated for nearly four years by the time of trial. As the court correctly noted, a correctional facility is not an option as a home for a child, let alone an appropriate home. For this reason, it is not feasible to return the Child to Father's custody.

Based on our careful review of the evidence, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. Having also determined that one statutory ground was established by the same quantum of proof, we affirm the trial court's termination of Father's parental rights to the Child.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's determination regarding abandonment by an incarcerated parent exhibiting wanton disregard under Tennessee Code Annotated § 36-1-102(1)(A)(iv). We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Kevin W.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE